UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

LIBERTY GLOBAL LOGISTICS LLC,
LIBERTY MARITIME CORPORATION,
LIBERTY PRIDE CORPORATION, and
LIBERTY PROMISE CORPORATION,

                        Plaintiff,

      -against-

UNITED STATES MARITIME
ADMINISTRATION; DAVID T. MATSUDA,
as United States Maritime Administrator;
UNITED STATED DEPARTMENT OF
TRANSPORTATION, RAYMOND H.
LAHOOD, as United States Secretary of
Transportation, and THE UNITED STATES
OF AMERICA,

                        Defendants.

-------------------------------------------------x

**MEMORANDUM & ORDER**

13-cv-0399 (ENV) (JMA)

VITALIANO, D.J.,

       Plaintiff Liberty Global Logistics ("Liberty") brings suit on behalf of itself and its affiliates against the United States Maritime Administration ("MarAd"), David T. Matsuda, U.S. Department of Transportation ("DOT"), Raymond H. LaHood and the United States seeking relief under the Administrative Procedure Act ("APA") and Freedom of Information Act ("FOIA"). Liberty principally alleges that MarAd acted arbitrarily and capriciously in awarding contracts to certain of Liberty's competitors and in approving the transfer of other contracts among these same competitors. Defendants have moved, pursuant to Rule 12(b)(1), to dismiss Liberty's APA claims, citing lack of standing, mootness, and other

1

jurisdictional defects. Defendants have also moved to dismiss Liberty's FOIA claims as moot. For the reasons discussed below, the motion is granted in full.

## Background

MarAd, an agency within DOT, oversees the Maritime Security Program ("MSP"), a program authorized initially by the Maritime Security Act of 1996 and re-authorized in 2003 ("MSA 2003"). With the Persian Gulf War having exposed the virtual demise of America's sealift capacity, the maritime security program was enacted to ensure that militarily useful vessels are available to the United States government in the event of war or national emergency. Under the MSP, MarAd subsidizes approximately 60 privately-owned commercial vessels that are engaged in U.S.-foreign trade by entering into operating agreements ("OAs") with the vessel owners. Those agreements mandate a direct payment by the United States to the vessel owner of $3.1 million per year, which is intended, in part, to compensate owners for the increased cost of registering as a "United States-flag" vessel rather than a "foreign-flag" vessel. In exchange for the $3.1 million annual subsidy, the vessel owner agrees to ensure the vessel's availability to the military in the event of war or national emergency.

MSA 2003 adopted certain eligibility requirements for participation in MSP based on the vessel's type and ownership. With respect to ownership, MSA 2003 provided a four tier prioritization scheme of eligible ownership arrangements, listed here in descending order of priority: (1) a vessel owned and operated by a U.S. citizen as defined at 46 U.S.C. § 50501 (a "Section 2 citizen"); (2) a vessel owned by a Section 2 citizen but chartered to an entity eligible to document the vessel under the

2

U.S. flag (a "documentation citizen"); (3) a vessel owned and operated by a defense contractor; and (4) a vessel owned by a documentation citizen but chartered to a Section 2 citizen.  In general, while a Section 2 citizen is an entity owned and controlled by U.S. citizens, a documentation citizen is an entity organized in the U.S. and whose executive officers are U.S. citizens, but whose owners may not be U.S. citizens.  With respect to vessel type, MSA 2003 also established a four-tier priority system for awarding OAs: first, to any eligible "tank vessel"; second, to any fleet vessel already participating in the program prior to 2003; third, to eligible vessels operated by a Section 2 citizen; and fourth, to any other eligible vessel.

Under MSA 2003, participating vessels are authorized to—and often do—transfer their OAs to other vessels eligible to participate in the program, subject to approval by the Secretary of Transportation and the Secretary of Defense.  By regulation, MarAd requires that OAs be transferred only to persons "of the same or more restrictive U.S. citizen priority."  46 C.F.R. § 296.30(j).  Further, in 2006, Congress modified MSA 2003 to provide that MarAd could not approve transfer of an OA to a non-Section 2 citizen unless there was not a Section 2 citizen with an eligible vessel interested in the OA.  Additionally, by regulation, MarAd requires that any replacement vessel "must qualify with the same or with more military useful capability as the MSP vessel to be replaced."  46 C.F.R. § 296.30(c).

MSA 2003 authorized MSP only through fiscal year 2015.  In 2013, Congress enacted the National Defense Authorization Act of 2013, 126 Stat. 1632 § 3508 ("NDAA"), which made certain changes to the MSP statutory scheme.  First, NDAA required MarAd to extend all existing OAs through 2025.  Second, NDAA

3

eliminated the four-tier priority scheme for the award of new OAs, now giving priority to Section 2 citizens only "after consideration of military requirements." NDAA § 3508(c)(2). Finally, NDAA removed the restriction on the transfer of OAs to non-Section 2 citizens, requiring only that the transfer be to a person "that is eligible to enter into the operating agreement" subject to a determination by the Secretary of Transportation and Secretary of Defense that "the transfer is in the best interest of the United States." NDAA § 3508(e)(1). The 2014 NDAA did not contain any provisions pertaining to the maritime security program. See National Defense Authorization Act of 2014, H.R. 3304, Pub. L. 113-96 §§ 3501-04.

Liberty has been a participant in MSP since 2004. Specifically, in 2004 Liberty attempted to enroll two of its vessels in the MSP, and was ultimately awarded a single OA. Subsequent to its receipt of that OA, Liberty built additional vessels, allegedly of excellent military usefulness, for which it has been trying unsuccessfully to obtain operating agreements for many years. This lawsuit arises out of Liberty's inability to obtain additional OAs. In short, Liberty is a disgruntled suitor for government subsidies, and seeks judicial intervention.

In particular, Liberty seeks relief based on certain actions taken by MarAd in the period from 2007 through 2011 that Liberty alleges were arbitrary and capricious. Liberty asserts ten claims under the APA relating to the following alleged actions taken by MarAd: (I) approval of the transfer of OA #98 to American International Shipping LLC ("AIS") without a determination that AIS was a Section 2 citizen; (II) approval of Argent Marine Management ("Argent") as a

4

Section 2 citizen based on an incorrect application of the citizenship standard; (III) awarding OA #108 to Argent; (IV) approval of the replacement of vessel Maersk Michigan with vessel Alliance Charleston under OA #108 without making the requisite finding of military capability; (V) approval of the replacement of vessel Patriot with vessel Ocean Freedom under OA #67 without making the requisite finding of military capability; (VI) approval of AIS as an "operator" within the meaning of MarAd's regulations; (VII) approval of Argent as an "operator" within the meaning of MarAd's regulations; (VIII) approval of Fidelio Limited Partnership ("Fidelio") as an "operator" within the meaning of MarAd's regulations; (IX) discontinuing the practice of publishing its decisions for public comment in favor of a "secretive" decision-making process; and (X) allowing Argent to revise a bid in secret. Liberty also interposes two claims under FOIA based on the following alleged actions: (XI) MarAd's failure to produce all documents covered by Liberty's FOIA request 12-022, and (XII) MarAd's failure to publish all of its decisions of precedential value.

Liberty's claims can be grouped into five categories: (1) MarAd's award of OA #108 to Argent, an entity with an allegedly lower priority citizenship classification than Liberty's vessels (Counts II, III, VII and X), (2) MarAd's approval of the transfer of OA #98 from Wallenius Lines Holding, Inc. ("Wallenius") to AIS, with Fidelio acting as an intermediary (Counts I, VI and VIII); (3) MarAd's approval of two replacement vessels without making the statutorily required determination regarding military usefulness (Counts IV and V);

(4) MarAd's alleged decision in 2005 to stop publishing its opinions and its adoption of a "secretive" decision-making process (Count IX); and (5) MarAd's improper withholding of certain documents that Liberty requested pursuant to FOIA (Counts XI and XII). With respect to Liberty's ADA claims, MarAd argues principally that Liberty lacks standing. MarAd further contends that Liberty's APA claims have been mooted by the NDAA and that, pursuant to the Hobbs Act, the claims should have been brought initially in an appellate court. Finally, MarAd argues that Liberty's FOIA claims have been mooted by MarAd's production of the requested documents subsequent to Liberty's filing of the instant action.

## Standard of Review

Plaintiffs bear the burden of demonstrating that subject matter jurisdiction exists. *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011). Standing is a federal jurisdictional issue, and a plaintiff must demonstrate standing for each claim and form of relief sought. *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010). In order to establish standing, a plaintiff must demonstrate "(1) that he suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there was a causal connection between the injury and the conduct complained of; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citations omitted). Where, as here, standing is challenged on the basis of the pleadings, the Court must "accept as true all material allegations of the complaint, and must construe the

complaint in favor of the complaining party." *Id.*

The APA provides that "a person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, in order for a reviewing court to set aside an agency action, it must find that the agency's findings and conclusions are unlawful in some way. 5 U.S.C. § 706(2). Liberty contends that MarAd's determinations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A).

Discussion

A. <u>APA Claims</u>

   I. <u>Hobbs Act</u>

Under the Administrative Orders Review Act—also known as the Hobbs Act[1]—the court of appeals, in all jurisdictions except for the Federal Circuit, has exclusive jurisdiction to "enjoin, set aside, suspend . . . or to determine the validity of" all "rules, regulations or final orders" that the Secretary of Transportation issues "pursuant to" certain enumerated statutes. 28 U.S.C. §2343(3)(A). One such enumerated statute is 46 U.S.C. § 50501, which sets forth the definition of Section 2 citizenship. MarAd contends, because of this provision, that Liberty's claims related to Section 2 citizenship—Counts I–VIII and Count X—could have been brought only in the court of appeals. Liberty, in opposition, contends that it is not

---

[1]   Not to be confused with the separate Hobbs Act dealing with robbery and extortion. <u>See</u> 18 U.S.C. § 1951.

challenging any "rules, regulations or final orders," made pursuant to § 50501. To the contrary, Liberty contends that MarAd awarded OA #108 "pursuant to" MSA 2003 (which is not an enumerated Hobbs Act statute), and that the statutory definition of Section 2 citizenship contained in § 50501 is only tangentially connected to the challenged action.

The few courts that have addressed this issue support the view advanced by MarAd. Most notably, in *Conoco, Inc. v. Skinner*, 970 F.2d 1206 (3d Cir. 1992), the plaintiff challenged regulations issued by MarAd and the Coast Guard which related to Section 2 citizenship. The third circuit held that the Hobbs Act vested exclusive jurisdiction for plaintiffs' challenges to both regulations in the court of appeals, as "[t]he Hobbs Act should be liberally construed to allow exclusive jurisdiction in the court of appeals." *Id.* at 1214. Indeed, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, [the Court should] not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985). In *Conoco*, the court rejected plaintiffs' argument that the subject Coast Guard regulation was issued "pursuant to" vessel documentation laws rather than § 50501, concluding that "[t]his reading of 'pursuant to' is far too narrow." *Conoco* at 1214. In fact, the court noted that "pursuant to" is commonly defined as "acting or done in consequence or in prosecution (of anything); hence, agreeable, conformable; following; according." *Id.* (citing *Old Colony Trust Co. v. Commissioner of Internal Revenue*, 301 U.S. 379 (1937)). Further, and critical to the instant case, the court held that "[e]ven if we

8

adopted a narrow view of 'pursuant to,' we could find exclusive jurisdiction on the ground that the vessel documentation laws and section 2 are interrelated." *Id.*

Here, similarly, regardless of whether the Court concludes that Liberty's APA claims originated under MSA 2003 or § 50501, it is clear that the central issue is that of Section 2 citizenship, and that MSA 2003 and § 50501 are highly interrelated. The crux of Liberty's complaint is, clearly, that it was improperly passed over for certain OAs because MarAd incorrectly concluded that Argent and AIS were proper Section 2 citizens. The adjudication of this claim would seem to rest almost entirely on the reviewing court's evaluation of MarAd's interpretation of the statutory Section 2 citizenship definition. It is an issue properly litigated in the appropriate court of appeals. Plaintiff's attempt to re-cast its claims as arising under MSA 2003 is unavailing. *See Conoco* at 1214; *Energy Transportation Group, Inc. v. Skinner*, 752 F. Supp. 1, 36 (D.D.C. 1990) ("[Plaintiff] has attempted to sidestep the jurisdictional bar by arguing it is not challenging the validity of MarAd's determination, but rather is challenging the validity of MarAd's process in reaching this determination. The Court believes this is a distinction without a difference. To determine the validity of MarAd's citizenship determination, the court of appeals must *a fortiari* determine the validity of the process used to make that determination.") Bathed in this light, plainly, the Court lacks jurisdiction over Count I through and including Count VIII as well as Count X,[2] all of which should

---

[2]    Count X is somewhat different from the other APA counts in that it challenges the "secretive" method by which MarAd allegedly permitted Argent to revise its bid for OA #108 rather than the award itself. Nevertheless, any inquiry into

have been brought initially in the court of appeals.

II.    Standing

The government contends that, in addition to being precluded from bringing its claims in this Court due to the Hobbs Act, Liberty also lacks standing to pursue Counts I – VIII and Count X for multiple reasons. Although, as discussed above, the Court concludes that it lacks jurisdiction over these claims, in light of the paucity of caselaw on the Hobbs Act issue, much less precedents from this Circuit, the Court will also address the government's standing arguments.

a.    Injury-In-Fact

MarAd contends that Liberty lacks standing to assert its APA claims because Liberty's "bare allegation" that "it was deprived of an opportunity to compete" for certain OAs is insufficient to demonstrate a concrete, particularized injury. (Def. Mem. of Law at 15.) According to MarAd, it would be pure speculation for the Court to assume that Liberty would have received OA #98 or OA #108 in the counter-factual circumstance in which the OAs were not awarded to the competitors of Liberty to whom they were awarded. Contrary to MarAd's contention, however, Liberty's allegations are sufficient to establish injury-in-fact at the pleading stage. This is so because, under the "well-established concept of competitors' standing," the "loss of 'opportunity to compete equally'" is sufficient to establish standing. *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (quoting *Fulani v. League of Women*

Count X would necessarily entail an analysis of whether OA #108 was improvidently granted in light of Argent's citizenship status and, accordingly, is part of the set of claims that Liberty should have pursued as an initial matter in the court of appeals.

*Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989)). Here, Liberty has alleged that it is a direct and current competitor to both Argent and AIS; that it was the owner of highly qualified vessels that ranked higher than its competitors' vessels in the MSA 2003 prioritization scheme; and that MarAd's allegedly improper determinations with respect to the status of AIS, Argent and Fidelio cost Liberty the opportunity to compete for contracts worth $3.1 million per year. These allegations, accepted as true, satisfy the injury-in-fact prong of the standing inquiry. *See Lee v. Board of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) ("[T]o show competitor standing a plaintiff must show that he personally competes in the same arena."); *Kerm Inc. v. FCC*, 353 F.3d 57, 59 (D.C.C. 2004) ("A party seeking to establish standing on this basis must demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action.")

b. <u>Causation</u>

MarAd next argues that, even assuming Liberty has established injury-in-fact, MarAd did not cause any of Liberty's injuries. MarAd pursues this argument only with respect to Liberty's claims involving MarAd's approval of the OA #98 transfer and MarAd's approval of replacement vessels (Counts I, IV, V, VI, VIII)— not its claims involving MarAd's award of OA #108 to Argent. According to MarAd, these transfers, despite being subject to MarAd's approval, were essentially private transactions. As a consequence, the injury, if any to Liberty, was caused by the private entities that initiated the transfers and vessel replacements, not by MarAd. Liberty contends, on the other hand, that it is merely challenging MarAd's

11

*approval* of these private transactions, which was a necessary step in their completion.

"[S]tanding is 'substantially more difficult to establish' in cases where 'the plaintiff is not himself the object of the government action or inaction he challenges.'" *Lee* at 912 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). Although courts in this circuit have not directly addressed whether a plaintiff has standing to challenge agency approvals under similar circumstances, cases from other jurisdictions convincingly teach that a litigant in Liberty's shoes cannot establish causation. In particular, a series of decisions in the D.C. Circuit stand for the proposition that, where a plaintiff cannot demonstrate that his injury would have been remedied in the absence of the government approval in question, that plaintiff lacks standing. *See Cherry v. FCC*, 641 F.3d 494, 498 (D.C. Cir. 2011) (no causation where plaintiff's "alleged injuries are not attributable to the Commission's approval of the license assignments . . . but rather to the judicial foreclosure action before the New York court."); *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410 (D.C. Cir. 1998); *Am. W. Airlines, Inc. v. Burnley*, 838 F.2d 1343 (D.C. Cir. 1988).

Here, Liberty's real gripe with respect to the transfer of OA #98 is not with MarAd but with Wallenius, which decided to sell OA #98 to AIS, through Fidelio. Notably, Liberty does not allege that Wallenius was ineligible to participate in the MSP when it decided to transfer OA #98. Presumably, therefore, had MarAd not approved this transfer, OA #98 would have simply remained with Wallenius, which would have been free to retain OA #98 or to seek a new transferee of Wallenius's

choosing—not MarAd's. In other words, Liberty was operationally situated identically regardless of whether MarAd approved the transfer of OA #98 or did not, which is fatal to Liberty's claim that the approval Liberty challenges here caused Liberty's injury.[3]

Liberty's claims regarding MarAd's allegedly improper approval of replacement vessels (Counts IV and V) suffer from the same defect. Liberty does not allege that the vessels being replaced—the Maersk Michigan and the Patriot—were ineligible to participate in the MSP at the time of replacement. Derivatively, had MarAd rejected the replacement applications, the relevant OAs would have still remained with the vessel owners, who would have been free either to continue operation of the existing vessels or to seek alternative replacement vessels. In either instance, Liberty would be situated identically to its position following whatever action MarAd took on the approval applications, which, in turn, indicates that the

---

[3] In support of its causation argument Liberty relies heavily on *District No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Maritime Admin*, 215 F.3d 37, 40-41 (D.C. Cir. 2000), in which a union representing workers on maritime vessels challenged MarAd's approval of the transfer of the registry of those vessels from the United States to a foreign country. The court of appeals there rejected MarAd's standing argument, concluding that the union's allegation that MarAd's approval would cause the union adverse economic consequences sufficiently "demonstrated both the injury in fact and the causation necessary to give it constitutional standing." *Id.* at 41. Instructively, the injury in *District 1* was the loss of union jobs that would have resulted from the transfer itself. In the absence of MarAd approval, the union would have retained its jobs and suffered no injury. *Id.* Here, by contrast, in the absence of MarAd approval, OA #98 would have remained with its prior owner—an entity other than Liberty— which would have left Liberty no better off. In other words, viewed with the spotlight on the claimed injury, MarAd's action in the former case changed the status quo but in this case it changed nothing.

approval itself did not cause any injury to Liberty. Hence, Counts I, IV, V, VI and VIII must be dismissed for want of the causation essential to standing, in addition to failing due to the Hobbs Act, as discussed in Section I, *supra*.[4]

    c. Redressability

MarAd contends that Liberty's APA claims are incapable of redress because NDAA eliminated the four-tier citizenship priority scheme of MSA 2003 in favor of a determination based primarily on military usefulness. As MarAd notes, Liberty throughout its complaint emphasizes its status as a Section 2 citizen as the primary reason why it should have been considered for OA #108. MarAd advances the view that, because NDAA subsumed the statutory preference for Section 2 citizenship as part of the newly created standard mandating considerations of military utility, there is no reason to believe that Liberty would ultimately receive OA #108 should the Court set aside MarAd's granting of OA #108 to Argent and force MarAd to re-issue it. This contention, which is essentially a repeat of MarAd's argument about the injury-in-fact prong, is unavailing. As an initial matter, it is significant that Liberty has alleged that it owns multiple ships of excellent military quality, which, it alleges further, would be likely candidates for OA #108, should MarAd have to re-issue it. More fundamentally, the cognizable constitutional injury of which Liberty complains is the denial of the opportunity to compete for OA #108 when MarAd

---

[4] Because, putting aside the Hobbs Act jurisdictional issue, the Court dismisses these counts based on plaintiff's failure to adequately plead causation, the Court declines to address MarAd's argument with respect to Counts IV and V that determinations of military utility are committed to agency discretion by law and, therefore, are unreviewable by the Court.

initially awarded it. Although it is certainly true that Liberty would not be guaranteed to receive the subsidy should the Court invalidate its award to Argent, Liberty would be guaranteed the opportunity to compete for that contract, which is what matters.

### d. Mootness

In an echo of its redressability argument, MarAd next argues that Liberty's APA claims have been mooted by Congress's adoption of NDAA. In particular, MarAd notes that NDAA mandated the extension of all existing OAs—including OA #108—through 2025. Because Liberty's claims are "based entirely on the old MSP scheme," MarAd contends that Liberty seeks a judicial remedy contrary to an Act of Congress. (Def. Mem. of Law at 20.)

Defendants' contention again is unavailing. First, it is important that NDAA amended MSA 2003—it did not repeal it. Thus, Liberty is not suing under a statute that has been entirely replaced. Moreover, as defendants note, NDAA mandated that existing OAs be extended through 2025, it did not terminate and replace those OAs. Nor did NDAA expressly enact the existing distribution of OAs or even suggest the insulation of any MarAd OA determination from judicial review under APA. As a result, if MarAd improperly awarded OA #108 to Argent under the old statutory scheme, the fact that NDAA extended that contract for an additional decade does not moot any injury suffered by Liberty as a result of a past improper award by MarAd. At bottom, Liberty's claims regarding OA #108 have not been mooted by the amendatory effect of NDAA.

### III.   APA Claims, Count IX

Focusing on a secondary target, Liberty challenges MarAd's alleged reversal of its policy of making available to the public "significant MSP actions." According to Liberty, MarAd has not published a single MSP-related decision since 2005 despite regulations requiring it to publish any decisions that are "reasonably expected to have precedential value." (Am. Compl. ¶¶ 75-76) (citing 49 C.F.R. §§ 7.5(a)(2) & 7.7). MarAd retorts that Liberty lacks standing to assert this claim, and, in any event, that the allegation is a generalized grievance which is not cognizable under APA.

Liberty urges that it possesses standing based on the doctrine of "informational standing." Yet, "to the extent that the concept of informational standing has received any recognition, it has been limited to very specific statutory contexts where a statutory provision has explicitly created a right to information." *Taylor v. Bernanke*, 2013 U.S. Dist. LEXIS 128533, at *42 (E.D.N.Y. 2013). It is noteworthy that no court in this circuit has ever found that a plaintiff successfully pled informational standing. In other circuits, courts have held that, in order to establish informational standing, a plaintiff must "(1) identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, (2) show that it has been denied the information to which it is entitled, and (3) provide a credible claim that the information would be helpful to it." *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92 (D.D.C. 2012). Even courts that have acknowledged the principle of informational standing have noted that it does "not extend to situations where the plaintiff's view of the statute would not directly entitle it to the information it seeks." *Id.*

16

Assuming, *arguendo*, that the theoretical possibility of informational standing was recognized in this circuit, Liberty has not established the requisite elements to invoke it. Liberty certainly does identify regulations that it claims directly require MarAd to disclose the information it seeks—namely 49 C.F.R. §§7.5(a)(2) and 7.7, which require MarAd to publish decisions that are "reasonably expected to have precedential value." However, Liberty fails thereafter to plead what else is required to satisfy the informational standing inquiry because it has not demonstrated that it has been denied any information to which it is entitled. That is so because Liberty has not shown that MarAd actually issued any decisions post-2005 that had precedential value—a prerequisite for publishing the opinions that explain them. Although Liberty assumes that MarAd must have issued at least one such decision in that timeframe, that naked assumption, standing alone, cannot carry the day. The challenge is dismissed for want of standing.[5]

## IV. FOIA Claims

### a. Count XI

In Count XI, Liberty alleges that MarAd failed to produce certain documents it requested pursuant to FOIA and that MarAd also failed to "properly assess and utilize FOIA exemptions through repeated and flagrant overly broad redaction."

---

[5] Given the Court dismisses Count IX on this basis, it does not reach MarAd alternative argument that Liberty's allegations are too generalized to be cognizable under the APA. Further, because its disposition is unnecessary to the instant motion, the Court also declines to reach the issue raised by defendant for the first time in its reply brief and discussed in plaintiff's sur-reply brief—that is, whether Liberty is a "contractor" within the meaning of 46 C.F.R. §296.50(a) such that Liberty would have had to file an administrative appeal with MarAd prior to bringing its APA claims.

(Am. Compl. ¶ 293.) MarAd argues that the majority of Liberty's FOIA claims have not been exhausted, and that the exhausted claims have been mooted by MarAd's production of documents subsequent to the filing of the instant action. As a consequence, MarAd asks that Liberty's claims be dismissed as moot, or, in the alternative, that the Court grant summary judgment in favor of defendants. Liberty replies, contrarily, that it did completely exhaust its requests, and, in any event, complete exhaustion was unnecessary, given the likelihood that MarAd would deny its request.

As alleged, Liberty filed a FOIA request with MarAd on December 5, 2011, seeking a variety of documents that could serve as the basis for the instant complaint. It sought materials related to MarAd's award of OA #108 to Argent. MarAd acknowledged receipt of the FOIA request on December 7, 2011 and assigned the request control number 12-022 ("FOIA 12-022"). Following a three month period of inactivity and prompted by further inquiry from Liberty, MarAd produced certain documents responsive to FOIA 12-022 on March 16, 2012. On March 27, 2012 Liberty responded by letter to MarAd's March 16 production, identifying an additional 15 documents that it believed to be responsive to FOIA 12-022 that MarAd had failed to produce. Shortly thereafter, on April 11, 2012, Liberty filed an official appeal with MarAd challenging certain redactions that MarAd made in the March 16 production.

Throughout the summer and fall of 2012, Liberty and MarAd corresponded extensively about FOIA 12-022, with Liberty repeatedly complaining to MarAd about both the contents and the speed of MarAd's production. Although MarAd

did produce some additional documents on September 20, 2012 and again on January 3, 2013, those productions failed to satisfy Liberty. Further, on March 28, 2013 MarAd officially denied Liberty's April 11, 2012 appeal of the redactions made in MarAd's March 16, 2012 production. Liberty now seeks review, demanding a roll-back of the redactions made in MarAd's production, and also complains that four of the 15 outstanding documents identified by Liberty in its March 27, 2012 letter remained unproduced at the time of the filing of this lawsuit.

"Consistent with its purpose to promote honest and open government, and to assure the existence of an informed citizenry in order to hold the governors accountable to the governed FOIA strongly favors a policy of disclosure." *Brennan Ctr. for Justice v. United States*, 697 F.3d 184, 194 (2d Cir. 2012). FOIA requires the government to disclose records unless the documents fall within one of the specified statutory exemption, which, "[c]onsistent with FOIA's purposes . . . are narrowly construed." *Id.* "An agency withholding documents responsive to a FOIA request bears the burden of proving the applicability of claimed exemptions." *ACLU v. DOJ*, 681 F.3d 61, 69 (2d Cir. 2012). "Affidavits or declarations giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Id.*

As a threshold matter, the parties disagree as to whether Liberty can advance claims related to documents produced subsequent to March 16, 2012, because, according to MarAd, Liberty only exhausted MarAd's official appeals process with respect to the March 16 production. This argument is not a winning one. A review of the many letters exchanged by the parties throughout 2012 and 2013 clearly

19

indicates that (a) all of the documents Liberty requested before and after March 16, 2012 were responsive to FOIA 12-022, and (b) Liberty repeatedly raised with MarAd throughout 2012 and 2013 the deficiencies that it perceived in MarAd's production. Plaintiff further alleges—and the correspondence supports—that MarAd frequently missed deadlines imposed by FOIA, sometimes responding to Liberty months after deadlines had passed. Under these circumstances, MarAd's contention that Liberty cannot seek judicial review because Liberty failed to fully exhaust a certain formal administrative process with respect to a subset of its claims falls flat. *See Robert v. DOJ*, 193 Fed. Appx. 8, 9 (2d Cir. 2006) ("FOIA provides that request denials may be appealed to the heads of agencies . . . and requesters are required to exhaust this administrative remedy before turning to litigation— although they may be deemed to have exhausted constructively if the agency fails to make a timely response to the initial request.") *Mackey v. Bd of Educ.*, 386 F.3d 158, 162 (2d Cir. 2004) (exhaustion not necessary where "failure to exhaust had been the direct result of the [other party's] persistent and excessive untimeliness."). Liberty, the Court finds, effectively exhausted all of its FOIA requests pursuant to which it now alleges that MarAd has improperly withheld or redacted documents.

The Court next addresses Liberty's substantive allegations about improperly withheld documents. The amended complaint identifies four documents responsive to Liberty's FOIA request that it alleges MarAd improperly withheld: (1) MarAd's January 13, 2009 approval to offer OA #108 to Ocean Shipholdings, Inc; (2) MarAd's September 30, 2009 letter to Argent offering it OA #108; (3) a May 27, 2011 e-mail regarding the vessel Alliance Charleston; and (4) a July 14, 2011 letter

from Argent to MarAd. (Am. Compl. ¶ 294). Critically, although MarAd's production of these documents occurred later than Liberty would have preferred, the parties agree that MarAd has now produced all four documents. (Def. Mem. of Law at 40; Pl. Mem. of Law at 54; Ex. 11). Notwithstanding, Liberty contends in its opposition brief that it has now identified additional documents that it believes have been improperly withheld. Yet, those allegations are not properly before the Court as those documents were not specifically identified in Liberty's amended complaint. With respect to the grievances actually alleged in the amended complaint, those grievances are moot and the claim is dismissed. *Muset v. Ishimaru*, 783 F. Supp. 2d 360, 372 (E.D.N.Y. 2011) ("Despite the delay, the documents that were the subject of the FOIA request were produced by the IRS, albeit after this action was filed. Therefore, [plaintiff's] claim for relief under FOIA became moot when he received the requested documents.")

Liberty additionally complains that MarAd improperly redacted certain documents, pointing specifically to a production MarAd made on September 20, 2012, which fully redacted 611 of the 736 pages. Further, of the 125 pages not fully redacted, only 29 had any text other than the title. The documents from the September 20 production were documents that MarAd received from Argent—upon MarAd's request—that related to Argent's business operations. MarAd claims that these documents contained information exempt from disclosure pursuant to FOIA Exemption 4.

FOIA Exemption 4 protects "trade secrets and commercial or financial information." 5 U.S.C. § 552(b)(4). Exemption 4 "applies if a tripartite test is

satisfied: (1) The information for which exemption is sought must be a trade secret or commercial or financial in character; (2) it must be obtained from a person; and (3) it must be privileged or confidential." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010). MarAd contends that the redacted documents meet all three requirements. First, the documents were clearly "commercial" in character, as they pertain to a private company's business operations. Second, the documents were obtained from a person, namely, Argent. Third, the documents were "confidential" in that disclosure of the documents would cause a "substantial harm to the competitive position of the person from whom the information was obtained." *Inner City Press v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006).

Liberty does not dispute that the redacted documents meet these three elements, but, instead, contends that MarAd produced unredacted versions of similar documents (pertaining to a different company) pursuant to a different FOIA request. According to Liberty, MarAd's "inconsistent" treatment of redactions is a "hallmark of arbitrary agency conduct" and, therefore, renders application of Exemption 4 inappropriate. However, Liberty identifies no Second Circuit case law—and the Court is aware of none—supporting the argument that the government must be deemed to have waived its right to redact confidential information (of a third party) properly subject to FOIA Exemption 4 by failing to redact other, allegedly similar, information in response to a FOIA request of an unrelated party in an unrelated matter. Succinctly, Liberty has failed to refute (and acknowledges the literal propriety of) MarAd's showing that the redactions were

appropriate under FOIA Exemption 4.[6]  Consequently, Count XI is dismissed.

### b. Count XII

Count XII alleges that MarAd failed to "publish or otherwise make publicly available decisions of precedential value regarding its administration of the MSP program." (Am. Compl. ¶ 297.) MarAd's alleged failure to publish all of its decisions awarding OAs, approving OA transfers and/or approving replacement vessels violated, Liberty claims, 5 U.S.C. § 552(a)(2) and the agency's regulatory authority, 49 C.F.R. §§7.3-7.5, 7.7. These provisions plainly require that MarAd publish (1) opinions rendered in the adjudication of a case (5 U.S.C. § 552(a)(2)(A), 49 C.F.R. § 7.5(a)(1)), or (2) statements of policy adopted by the Department of Transportation (5 U.S.C. 552(a)(2)(B), 49 C.F.R. § 7.5(a)(2)). At threshold, Liberty fails to identify any "case" that was adjudicated by MarAd or any "statement of policy" that MarAd failed to publish. In any event, given that MarAd has now produced copies of all of its determinations (pursuant to Liberty's FOIA requests), there is no further remedy that could be provided by the Court. Hence, Count XII is academic and is dismissed as well.

### Conclusion

For the foregoing reasons, Counts I – VIII and Count X are dismissed because, pursuant to the Hobbs Act, those claims should have been brought in the first instance in the court of appeals of appropriate jurisdiction. In addition, even if this Court had jurisdiction over these claims, Counts I, IV, V, VI and VIII would be

---

[6]  Given this conclusion, the Court does not reach MarAd's alternative argument that the redactions were also appropriate under Exemption 5.

dismissed for want of the causation essential to standing.

Further, Liberty also lacks standing to bring Count IX for the reasons discussed in Section III, *supra*.

Plaintiff's FOIA claims, Counts XI and XII, are also dismissed for the reasons discussed above.

The Clerk of Court is directed to enter judgment in accordance with this Memorandum & Order and to close the case.

SO ORDERED.

Dated:      Brooklyn, New York
              August 25, 2014

s/Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge